IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

JACOB OHL, JAMES OHL, AND     )

CATRINA COOK, AS NATURAL      )

PARENTS OF JACOB OHL,         )

                              )

        PLAINTIFFS,           )

                              )

v.                            ) CASE NO:1:19-CV-01446-SCJ

                              )

CSX TRANSPORTATION, INC.,     )

                              )

        DEFENDANT.            )

                    *********

The remote deposition of Dr. Jonathan Eisenstat, taken on behalf of the Defendants, taken pursuant to agreement of counsel, taken for all purposes authorized by the Federal Rules of Civil Procedure; the reading and signing of the deposition being reserved; taken before Terri Gandy, CCR, Certified Court Reporter and Notary Public, commencing at 10:03 a.m., on this the 6th day of May 2021, via Zoom.

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

MR. CALE CONLEY

CONLEY GRIGGS PARTIN, LLP

4200 NORTHSIDE PARKWAY, NW

BLDG1, SUITE 300

ATLANTA, GEORGIA 30327-3007

(404) 809-2580

cale@conleygriggs.com

ON BEHALF OF THE DEFENDANT:

MR. JAMES R. CARNES

SHUMAKER, LOOP & KENDRICK, LLP

1000 JACKSON STREET

TOLEDO, OHIO 43604-5573

(419) 241-9000

jcarnes@shumaker.com

MR. DARYL CLARIDA

HALL, BLOCH, GARLAND & MEYER, LLP

900 CIRCLE 75 PARKWAY

SUITE 500

ATLANTA, GEORGIA 30339-3099

(678) 888-0036

darylclarida@hbgm.com

Page 3

INDEX TO PROCEEDINGS

Examination                                                      Page

By Mr. Carnes                                                       4



INDEX TO EXHIBITS

Defendant's          Description                                 Page
Exhibits


(No Exhibits were tendered.)

Page 4

REMOTE DEPOSITION OF DR. JONATHAN EISENSTAT

May 6, 2021

THE COURT REPORTER:  Before we proceed, I will ask counsel to agree on the record that under the current National Emergency pursuant to Section 319 of the Public Health Act, there is no objection to this deposition officer administering a binding oath to the witness remotely.  Please state your agreement on the record.

MR. CARNES:  This is James Carnes for CSX, I agree.

MR. CONLEY:  And I'm in agreement for Plaintiff.

Whereupon,

DR. JONATHAN EISENSTAT,

After having been first duly sworn, testified as follows:

EXAMINATION

BY MR. CARNES:

Q.   Hi Doctor.  My name is Jamie Carnes.  I'm an attorney for CSX Transportation, Inc. here to take your deposition today.  Just in terms of -- where are you today?  Are you in your office?

A.   I'm actually at my personal residence.

Page 5

Q.   Okay.  And what do you have with you today in preparation for this deposition?

A.   So I have my entire file electronically. And really the only thing I printed out was my opinion letter.

Q.   Okay.  And your opinion letter lists a number of items it says you reviewed concerning the case on page one of your report?

A.   Yes, sir.

Q.   Are those all of the materials you reviewed?

A.   No.  Since that time, I've received a couple of other documents that I reviewed as well.

Q.   And what are those documents?

A.   So I reviewed the deposition of Bryce Anderson.

Q.   Well, that's on the list.

A.   I'm sorry?

Q.   That's on the list.

A.   Oh, you're right.  I'm sorry.  I usually put in what -- I forgot that I put that I looked at his report and his deposition.  I apologize.

Q.   Okay.

A.   Then I think that's everything.

Q.   Okay.  Have you done anything since -- have you done anything in this case since July 25, 2020,

when you wrote this report?

A.    Let's take a look.  So the only thing -- no, no.  I didn't look at anything additional.  Except I received two pictures of the shoes from the scene, and that's the only other thing that I looked at.  And that's it.  I haven't done anything else really.

Q.    Okay.  Those are two photos of Jacob Ohl's shoes, you said?

A.    Yes, sir.

Q.    Okay.  Which shoe was it; do you know?

A.    It -- both shoes.

Q.    Oh, you look at both shoes?

A.    Yes, sir.  But I looked at them on photographs.  I didn't look at the actual shoes, just to clarify.

Q.    Okay.

THE WITNESS:  Carl, if you're saying something, we can't hear you.  You're on mute.

MR. CONLEY:  Jamie, you want me to send you the two pictures?

MR. CARNES:  Oh, sure.  Yeah, that will be good.

MR. CONLEY:  I'll -- I'll e-mail them to you just so you've got them.

MR. CARNES:  Yeah.

MR. CONLEY:  No problem.  I'm all for anything that will get us through this quicker this morning; so. I'll send them to you right know.

MR. CARNES:  I don't intend to be long.

MR. CONLEY:  I don't think you will be, but I just -- I don't want to -- I don't want he or you to have to go rifling through --

MR. CARNES:  No, no.  I appreciate it.

MR. CONLEY:  -- all that.  So here they go.

Q.   (By Mr. Carnes)  Okay.  Dr. Eisenstat, what is your current occupation?

A.   So I'm a forensic pathologist, and my full-time job is as the chief medical examiner for the Georgia Bureau of Investigations.

Q.   Okay.  And then I guess as a side or additional job you have Eisenstat Forensic Pathology, LLC?

A.   Correct.  So I've been doing consulting work for about 12 or 13 years now.  And I don't remember how long ago -- probably about five years I started the LLC because my consulting work got business.  But that's completely separate from my day job.

Q.   Okay.  Is that a single member LLC?

A.   Yes.  It's just me.

Q.   Okay.  And have you worked on cases with Mr. Bell's firm before or Mr. Bell?

A.   I think this is the only case I've had with Mr. Bell.

Q.   How about Mr. Conley?

A.   I have looked at a couple of other cases for him over the years.

Q.   Okay.  Do you know how many?

A.   Probably no more than five.

Q.   All right.  And were those all on plaintiff's side?

A.   Yes.  They were.

Q.   Did any -- I didn't see it in your list that you provided.  Have you ever testified in a case involving a railroad?

A.   I'm pretty sure I have.  But maybe one or two.  I would have to go and look.  If it was in the last four or five years, I can find out.  If it's earlier than that, then I won't be able to find out.

Q.   Do you have any specific recollection of doing that?

A.   Specific, no, I don't.

Q.   Okay.  Have you ever testified -- all right.  So you don't have -- you think you might have testified in a railroad case.  But as we sit here

today, you don't have any recollection?

A.    Yeah.  I can't remember.  And what I mean by that is I can't -- for some reason I know that I have the railroad in my mind.  I don't -- I don't know if I was hired by plaintiff or defense in that case.  And I don't recall if it -- I honestly don't recall.  That's in my consulting work.  My day job, I've seen, you know, decedents who have died.  But I don't think I've ever testified in my day job as it pertains to railroad accidents.

Q.    In your day job, are you generally then dealing with decedents as opposed to injured parties?

A.    That's correct.

Q.    And so is it fair to say that in your day job, you've never reviewed a case that involved an amputation involving a railroad where the -- where the person lived?

A.    Where the person lived in my -- from my day job; that's correct?

Q.    In other words, they wouldn't get to you if they survived, I take it?

A.    That's correct.

Q.    All right.  Have you ever reviewed a case -- I think I know the answer to this -- but have you ever reviewed a case involving an amputation as part of

your consulting work outside of your day job?

A.    Yes, I have.

Q.    You have.  When have you done that?

A.    I've -- over the last couple of years, I've probably looked at a few cases.  They're not railroad accidents --

Q.    Okay.

A.    -- but I've look at amputation cases for medical practice and injury causation cases separate from train accidents.

Q.    Okay.  I assume you have no -- well, let me ask you this:  In terms of decedents 'you said -- involving railroads, do you know about how many of those you've reviewed?

A.    Do you mean in my consulting work or my day job?  I'm sorry.  I need to --

Q.    Yeah.  Let me --

A.    -- keep those very separate.

Q.    Yeah, yeah.  That's fine.  In your day job?

A.    Oh, in my day job.  Well, I've probably seen -- I've reviewed about 20 cases, and that's a rough estimate.  As to how many I've autopsied myself, I'd say maybe about five to ten over the years.  But I oversee the death investigation for my office and we -- we rotate every morning and every afternoon.  We

discuss all of the cases.  So I've seen probably on the order of 20, maybe even more, train incident.

Q.   And when you say train incidents, out of those 20 train incidents, do you know how many involved vehicle accidents?  In other words, a train vehicle collision?

A.   Actually, no -- it wouldn't be a high percentage.  It would be a low percentage.

Q.   All right.  And what would the rest have involved?

A.   A mixture of suicides and accidents.

Q.   Okay.  And do you know about how many of those were suicides?

A.   I do not.

Q.   How do you determine if it's a suicide?

A.   So you look at the, the totality of the case.  So you look at the injury patterns.  If there's video, we request the video.  We utilize scene investigation.  We use historical information, like, the history of the individual.  Do they have psychiatric disorders such as depression, et cetera. We look at toxicology, things of that sort.  So we use the totality of the case.

Q.   Okay.  When you talk about historical, what does that involve?  What kind of things do you look

at?

A.    Look at medical records.  We look to see if there's any history of depression.  If there's any medications, you know.  Sometimes we're not told that it's depression, but we look to see if there's medications they're on that let us know that there may be an anxiety disorder or depression.  We look for any other medical history, any other social history.  Anything we really can get our hands on.

Q.    Do you talk to the family?

A.    Our investigators may talk to the family.  And certain circumstances we, as the medical examiner, may talk to the family, but usually that's through investigators.

Q.    All right.  In what circumstances would you talk to the family?

A.    If there was something that I really needed to delve into more that has -- that I would need -- we would need to have medical knowledge for because the investigators aren't, you know, medical trained.  They know the basics.  And, of course, if a family ever wants to speak to me or to one of my doctors, we'll speak to them.

Q.    Okay.  Now when you determined something's a suicide, I take it -- I mean -- you said you look at

the totality of the circumstances.  Is that ultimately just a judgment call on your part?

A.   Well, I mean, it's an opinion.  And when we decide what the manner of death is, and what the cause of death is for our decedents, we give that to more than a reasonable degree of medical certainty.  So I mean -- it's our opinion utilizing all of that information.

Q.   Okay.  Have you ever been wrong?

A.   Well -- I mean, I will tell you, in my opinion I don't think I've ever been wrong.  In this world, which has been highlighted obviously recently, there's always difference of opinions.  But, you know, in my opinion, I believe that I've decided on the right conclusions.

Q.   You ever had to change your opinion?

A.   Rarely.  Maybe once or twice in my career.  And really those changes of opinions are from undetermined to -- undetermined manner of death to a more -- we have five categories:  Natural, suicide, homicide, accident, and undetermined.  And if we don't feel that we have enough information to determine a manner of death, we state it as undetermined.  I've had maybe a couple of those cases in my 17 years that I've changed once I received more information.

Q.   What about the other way?   And maybe we're entering it this way, but not changing suicide to not a suicide, but some other manner of death or cause of death to suicide, have you had to do that in your career?

A.   You know, the ones that, that we would change would obviously be between -- if we had to -- would be between suicide, accident, and homicide.  I'm trying to think -- I know that I've advised, after meeting with one -- a couple of my doctors over the years, we have changed the manner of death.  I don't recall if we changed it from suicide to homicide or the reverse, or accident to one or the other.  But I know over my career, whether it had been me specifically, or it had been one of my doctors, it's maybe have happened a couple of times.

Q.   All right.  But specifically you, have you ever had to change the cause of death from accident to suicide?

A.   That's a manner of death --

Q.   Sorry, manner of death.

A.   -- that's okay.  I can't recall of the top of my head.

Q.   What about homicide to suicide?

A.   I don't think that way. I think maybe

suicide to homicide once.  But I don't think I've ever gone homicide to suicide.

Q.   Okay.  Now I'm probably going to jump around a little bit here in your report.  Well, actually before I go there, your CV.  You list in here -- I'm not going to go through it page-by-page, but I asked you about prior cases.  You also have a section in here called "Publications."  Do any of your publications relate to railroad injuries or facilities?

A.   Specific to that, no.  I mean blunt impact injuries, yes.  But I don't think I have anything specific to railroad incidents.

Q.   All right.  What about conference presentations specific to railroads?

A.   I don't believe so, no.

Q.   What about lectures?

A.   Again, same answer.  Not specific to railroad.

Q.   All right.  Is it fair to say that in your experience this is the first time you've had to look at a traumatic amputation involving a person and a train?

A.   Well, no.  I mean -- in our day job when we've seen -- in my day job, when I've seen train

incidents, they have come with amputations.  They just never come with isolated amputations.

Q.   Okay.  Is this the first one you've had to look at with an isolated amputation?

A.   This is the first case that I recall seeing with an isolated amputation, yes.

Q.   In other words, the ones you've looked at have involved amputations, but also, death as part of your day job?

A.   Well, there are amputations and other traumatic injuries that are consistent with, you know, one or the other manners of death.  So what I'll say is, in the number of trained incidents that I have reviewed, or I had done the autopsy myself in my career, I have seen cases where the decedents have had amputations.  But I have not seen a decedent that has had an isolated amputation.

Q.   Have you ever had a case where the person was laying on the tracks and struck by a train?

A.   Yes, I have.

Q.   Okay.  Do you know how many?

A.   I can't be specific.  It would be a couple of them.  Not the majority, probably just a couple.

Q.   Okay.  Is your jurisdiction as chief medical examiner is that for the entire state of Georgia?

A.    No.    We cover about 154, 155 counties in the state of Georgia.    I don't do any consulting work on -- well, if it's a death, I wouldn't do consulting work on a case that's in a jurisdiction I cover.    This was in Gwinnett County, which is not a jurisdiction I cover.

Q.    So are there --are there -- so there are multiple chief medical examiners?

A.    So Metro Atlanta -- yeah.    Georgia's a little weird with its system.    It's a mixed medical corner, excuse me, corner medical examiner system.    So Metro Atlanta, which is Fulton, Cobb, Dekalb, and Gwinnett counties, they all have their own freestanding medical examiner's offices.    So each one of those offices has their own chief medical examiner. And then my office, we cover probably about 70 percent of the state so the rest of the state outside of those four counties.    We have three offices and multiple doctors, and I'm the chief for that system.

Q.    Okay.    Let me ask you: You have some opinions here. I'm on the second page of your report.

A.    Okay.

Q.    It says you found no -- "In all records available to me I found no evidence that Jacob had any history of psychiatric illness other than adjustment

reaction secondary to the trauma of being struck by the train." What do you mean by that?

A. What I mean is that there's -- there's no document history of any depression, of any suicidal ideations. But when he was at Gwinnett Medical Center, he was seen by psychiatry, and the psychiatrist noted that, again, there was no history of any of that. The only possibility -- I'm sorry. The only documented psychiatric issue was adjustment reaction, which was due to this incident.

Q. All right. So just so I'm clear, your testimony is based on the records you reviewed. Jacob Ohl had no history of depression?

A. From what I reviewed, that's correct.

Q. All right. Would that be a relevant factor in your opinions in this case if he had a history of depression?

A. You know, it could. But again, it -- in my opinion this injury pattern is not somebody who is trying to intentionally take their life. So I would take it into account. But this injury pattern is just not what we've -- I've ever seen with suicide.

Q. All right. Depression, though, specifically is one of the things you mentioned earlier as one of the things you look for as part of historical

information?

A.   That's fair, yes.

Q.   Do you know if Jacob Ohl has ever undergone any kind of counseling prior to this incident?

A.   Not to my knowledge, no.

Q.   Did you speak with Jacob Ohl?

A.   No, sir.  I don't usually speak with the -- I speak with the attorneys.  I have not spoken with Mr. Ohl.

Q.   Okay.  Have you spoken with his mother?

A.   No, sir.

Q.   Have you spoken with his father?

A.   No. I have not spoken to any family members, or anybody else involved in the case other than the attorneys.

Q.   In forming your opinions, you never reviewed Jacob Ohl's sworn deposition testimony?

A.   No, I have not.

Q.   Okay.  You've never reviewed the testimony of his mother or father either?

A.   No.  Those were not supplied to me.

Q.   Okay.  All right.  Do you know what they had to say about his state of mind?

A.   No.  Since I haven't read the depositions, no, I do not.

Q.    Okay.  By the way, have you seen anywhere where -- you talk about suicide a little in here.  Have you seen where CSX or -- did any of the records you reviewed -- did you see some claim that Mr. Ohl was trying to commit suicide?

A.    Well, there was -- let me look back at my notes.  Give me one moment.  If you don't mind?

Q.    Sure.

A.    So the only thing I saw was the body cam video of officer Blimline.  They were speaking with Mr -- he was speaking with Mr. Martin.  And Mr. Martin stated that it looked intentional, take him straight to the psych ward.

Q.    Okay.

A.    So that's why -- that's why -- it -- I addressed it as, you know, there's -- to me, there's no indication that this was an intentional act.

Q.    Let me ask you:  There's a difference between an intentional act and a suicide attempt though; isn't there?

A.    Well, suicide is an intentional act --

Q.    Well --

A.    -- so.

Q.    But there's also intentional acts that aren't suicide attempts, correct?

A.   That's fair.

Q.   In other words -- I mean, there are people who just do reckless things, correct?

A.   Yeah, there are.

Q.   There are people who engage in some type of self harm that's short of a suicide attempt, correct?

A.   I agree.

Q.   Okay.  And so in that video, it didn't -- he didn't say that he thought it was a suicide.  He only said that -- to be fair, he only said that he thought it was an intentional act, correct?

A.   You're correct.  That's what he stated.

Q.   Okay.  You mentioned toxicology reports. Did you see a toxicology report in this case?

A.   I did not.

Q.   Okay.  Would it be -- do you know why one wouldn't have been done in this case?

A.   I do not.  And what I really mean by the toxicology report for us, is that the vast majority of those who -- I shouldn't say the vast majority.  But the majority of those who take their life, or actually who gets struck by trains are intoxicated.  But I don't recall seeing a toxicology report in this case, and I don't know why one would or would not have been taken.

Page 22

Q. All right. Do you know if one -- like a drug screen would be standard in a case like this normally?

A. I know in motor vehicle collisions they usually are. As far as it pertains to the train and a pedestrian struck by a train, I don't know if that's usually standard.

Q. One of the things you say in your report -- let me find it. It says, "The records do not reflect any significant physical injuries to Jacob other than those to his lower extremities." And that's page two, the last sentence of the second paragraph.

A. Okay.

Q. Did you see any evidence of physical injury to Jacob other than those to his lower extremities?

A. Nothing of significance, no.

Q. Okay. There's no indication that he was struck by the train other than his legs. In other words, there's no indication the train hit him and knocked him over, for instance, correct?

A. That's exactly correct. And that's important for me.

Q. Did know note any -- did you see any indication that there were injuries to his hands?

A. Let me look back. I don't believe so. What

I will say is, I don't recall seeing that documented that he had injuries to his hands.

Q.    Or his upper extremities?

A.    That's correct.

Q.    Okay.  Now since you've seen the body cam video of the officer you just referenced, you heard the conductor say that Mr. Ohl was lying on his back as the train passed over him, correct?

A.    I believe that's what he stated, correct.

Q.    And so I take it then your opinion is that the conductor was not telling the truth to the officer?

A.    Well, from my assessment of the injuries, that does not appear to be the truth.

Q.    Okay.  When you say your assessment of the injuries, what is your assessment?

A.    Well, my assessment just to -- to respond to what you just asked about the train personnel and what they stated, is that if he's lying on his back with his toes pointing up towards the air -- or towards the sky I should say, and he is struck on his right side. His right foot should have significant injuries. Whereas, at the pathology report, they talk about a few small erythematous areas.  But they don't talk about the -- any type of fractures, any type of

lacerations to the foot so that's part one.  This is much more consistent with his toes pointing downwards, and that he gets run over with his toes pointing downwards, and then the train strikes his feet.  I agree he is not standing.  I agree he is not struck by the train and thrown.  That to me would be moving me towards suicidal intent.  I agree that his legs are more horizontal.  I disagree that his feet, toes are pointing toward the air.  That just doesn't make sense.  He has no injuries along the right side of his body.  He has no stretch lacerations around the hip or the torso.  He has no other lacerations to show that his body was whipped where his right side of the body would have moved over towards the train as was shown in Mr. Anderson's video.  I'll just stop there.  That's some of the evidence.

Q.  Well -- okay.  Let's start with the first thing you noted.  Who has said that his toes were pointed upwards at the time he was hit?

A.  Well, if he's lying on his back, and he's not moving.  And then you look at the way that Mr. Anderson put the dummy there, I don't know what other way he would be -- first of all, that's such an odd position to lie in with the downslope.  But I don't under -- I don't know any other way that his toes

would be pointing.

Q.   Okay.  Let's go through that.  Do you know if the slope in that video Mr. Anderson did is the same as the -- is the same degree of slope as there was at the time of Mr. Ohl's accident?

A.   I don't.  But considering he did the reconstruction, I would hope that it would be accurate.

Q.   Well, you've -- you've seen body cam video and photos from the scene?

A.   I have.

Q.   All right.  Did it appear to you it was as sloped in those photos and videos as it was in the video Mr. Anderson did?

A.   Well -- I mean I see a slope.  There is a -- there's a shadow from the train being there.  I'm not an expert in looking at photographs like that.  But what I can say, there is a slope.  That's all I can really say.

Q.   All right.  In terms of -- you mentioned a dummy was used in Mr. Anderson's videos.  Obviously, a dummy is not the same as a live human being, correct?

A.   I agree with that.

Q.   In fact, the dummy would be made out of -- obviously made out of some kind of hard plastic or

something, right?

A.    It should, yes.

Q.    All right.  Do you know if the ankles -- there was an ankle joint that was movable on that dummy?

A.    I don't.  But again, if that is his expert report, I would hope that he would do it as close to reality as possible.  So I wasn't there for it.  I don't know specifically the articulations of the dummy.  What I will say is, that yes, you know, a person is usually more pliable than a dummy.  But that being said, the forces would still come in the same direction, and the body would still be turned to the right.  He has no abrasions to his back.  He has no -- as if somebody's being whipped around that's lying on their back.  So yes.  I don't know the specifics of the dummy.  But again, the injuries documented to Mr. Ohl are just not consistent with him lying on his back.

Q.    All right.  Let me -- let me just -- are you under the impression that Mr. Anderson's -- what Mr. Anderson was doing was trying to recreate the actual mechanism of injury to Mr. Ohl?

A.    My impression was that he was doing a reconstruction of the incident.

Q.    All right.  Did you review his deposition testimony?

A.    I did.

Q.    Did he say that that's what he was doing in his deposition testimony?

A.    Let me look at his -- my notes on his deposition.

Q.    Sure.  What kind of notes do you have?

A.    So I keep what's called my materials reviewed. And really what it is, is cut and paste from what I've reviewed.  There's really no opinions in it. Yeah.  There's really no opinions in it.  It's all cut and paste.

Q.    These are typed notes?

A.    Yes, sir.  They're either typed, or I literally take the PDF -- I cut the section, and I move it to -- and I paste it into my materials reviewed.

Q.    Okay.  In other words, as you go through and you see pertinent things in the record, you just cut and paste it so you have it all in one documents, right?

A.    That's correct.

Q.    Okay.  How many pages is that document?

A.    It's 18 pages.

Q.    Okay.  All right.  One second.  Are you talking about Mr. Anderson?

A.    Right.  So he -- I see that he was there to perform a human factors analysis.  But he gives opinions in his deposition as to the positioning of the body, and he's utilizing what he did.  So, you know, I'm just addressing what he stated.  But right, he's there for the human factors of the train crew.

Q.    Okay.  And it's fair to say that someone's going to lie down with their legs drapped over the rails -- if they're lying down on their back with their legs drapped over the rails, the back -- if they have the back of their calves on the rail -- I mean your calves are soft and fleshy, correct --

A.    Agreed.

Q.    -- for lack of a better term.  In other words, your legs are going to sink down a little when they're on the rails, right?

A.    I mean there not -- it's not like abdominal pan that's filled with fat.  I mean the calves are muscles.  Could you have -- you do have a little bit of fat that overlies it, but it's a muscle; so -- I mean -- let -- let's say that it sinks over the rail a little bit.  My -- it's not even going to sink an inch.  I mean it's -- it's going to be a minimal.  But

it really -- I mean -- yeah.  It won't even sink an inch.

Q.  All right.  It's going to sink more than a plastic dummy, correct?

A.  That's fair.

Q.  Yeah.  And if I were to drape my legs with my calves on -- if I were to lay on my back with my calves on the rail --

A.  Uh-huh.

Q.  -- or my lower legs on the rail, what would be the natural inclination for your feet?  Wouldn't it be to get -- go to a plantar -- wouldn't my feet go plantar flex at that point as opposed to pointing straight up in the air?

A.  If you're lying down with your feet -- I mean -- maybe --

Q.  If I'm lying -- If I'm lying down, and my legs are drapped over a rail, isn't the -- isn't the most natural position for my foot to fall as opposed to being straight up in the air, like that dummy was?

A.  It depends -- it depends on where -- excuse me, I need to get a sip of water.

Q.  Sure.

A.  What I would say is, is that if it's your calves that are on the rail, then they're going to

plantar flex a tiny bit.  But they're not going to -- I mean, you -- even a ballet dancer who's trained in pointing their toes, it's not going to go all the way down.  So maybe I shouldn't have said straight up in the air.  So it's going to be pointing up to some degree, but it's not going to be all the way horizontal.

Q.   Okay.  Is it going to depend on what part of your lower leg is resting against the rail?

A.   Well, yes.  I mean if you're resting your knees over the rail, then I guess you could get your feet further down.  So, yeah.  I guess it depends on the part.  But again -- well, I'll leave it at that.

Q.   Well, if his lower legs -- if he's on his back, and his lower legs -- if the rail is closer to his knee joint on his lower legs --

A.   Uh-huh.

Q.   -- then that would cause -- well, for one thing your ankle would drop lower, right, off the rail, correct?

A.   Sure.

Q.   And your leg -- your foot is going to plantar flex more, right?

A.   Yeah.  I agree with that.  That's what -- I was saying the same exact thing.

Page 31

Q.   Okay.  Are you testifying that it's impossible for that locomotive to -- that it's impossible for someone laying on their back with their lower legs over the rails -- that it would be impossible for a locomotive -- the plow of a locomotive to clear over a person's legs and feet?

A.   I would have to go back and look at what all the specific measurements are.  You know, I did see, if I remember correctly, something like the minimum height is three inches, or something to that effect.  So I'm not testifying that it's impossible.  But from what I've seen whether his -- if his feet are bent over -- or if his legs are bent over like this, then the knees or the portion that's allowing his leg or his foot to bend over, it's going to be higher up.  So I'd have to go back and look -- would have to look at measurements of everything from what the distance would be from the top of the rail with the specific person's knees and things of that sort.  So I don't like to say impossible.  But from what I've seen from the damage to the feet, which feet they are, and how the injuries to the -- the lack of other injuries, I -- it just doesn't -- it doesn't make sense that he's lying on his back with his legs up.  His toes are going to be pointing up to some degree.  And if not,

Page 32

if his feet are all the way on the ground, then his knees and his legs are going to be pointing up higher. That's just a natural bend; so --

Q.    I -- go on.

A.    -- no.  I was just going to say, so it just -- I'm not going to say it could never happen.  But from what I've seen in the testimony in this on this case -- in the evidence in this case, it just doesn't make any sense.

Q.    Did you do any kind of -- have you ever been to the scene?

A.    I have not.

Q.    Okay.  You haven't made any measurements yourself?

A.    No.  That's usually reconstruction or biomechanic people.  I don't usually do that.

Q.    Do you know what size shoe he wore?

A.    I was told he wears a size 12.

Q.    Okay.  Do you know -- I mean, you talked about a couple of things.  One is having his knees bent, and his feet flat on the ground.  But he doesn't -- well, I guess you're saying you don't know if it's possible that snow plow could go over and clear someone's feet if their legs are resting on the rail. You haven't looked into that?

A.    If they're lying on their back --

Q.    Right.

A.    -- and they're feet -- we'll go through different positions.  But if they're laying on their back with -- let's start at the lower portion -- from their ankle to their mid calf, let's say.  So then they're -- just like you have -- you have a point where you can flex.  But let's say my knuckles here are the knee, and the toes are out by the end of my fingers.  So if we're moving out further towards the feet, you see just by natural it's going to be higher and --

Q.    Right.

A.    -- so from a guy who wears 12 -- size 12 feet shoes if his legs are lying over towards the feet to, at a minimum, the middle of his calf, no it's not going to go run over it.  If you start getting towards the knees, then maybe the feet will go down further.  The feet would have to either be all the way down, but the knees would be higher.  And so -- I mean, if you just measure your knees, they're -- they're about five inches.  And from what I see -- and then you have the rail, which I don't know the exact measurement.  But again, is on the order, I'm sure, a couple of inches.  Then no, I don't see the knee getting under

it.

Q.    Okay.  My question really is -- and I think we're on the same page.  You're not ruling out that it's possible for someone to lay on their back, have their lower leg between they're knee and ankle at some point, wearing a size 12 shoe, have their leg drapped over the rail, and go under the snowplow of a locomotive?

A.    I would say that --

MR. CONLEY:  I'm going to object to the form of that one.  Sorry, John, I was getting off mute.  Let me just object to form, but go ahead.

A.    (By the Witness)  It is impossible, I mean, I guess it's possible.  Is it probable, it doesn't -- it's not probable in my opinion.

Q.    All right.  And you -- and when you say it's not probable in your opinion, did you employ some type of methodology to determine how probable or non-probable it is.

A.    Well, the methodology of just looking at the normal width of somebody's leg, and from what I received, I received -- let me tell you the exact code here.  But it's CFR 229.123, and it talks about minimum clearance is three inches.  Maximum clearance is six inches.  So if you look at -- I have not gone

Page 35

and done the specific measurements myself.  But I know what six inches looks like.  I measure injuries by inches all the time, and to have a -- the -- of course, now I just blanked on the word.  To have the track, and then a leg, that's six inches.

Q.   All right.  So your understanding of that regulation is that the six inch clearance is from what point to what point?  When you talk about the three to six inch clearance, what are you talking about?

A.   "Each lead locomotive shall be equipped with a pilot snowplow or endplate that extends across both rails.  The minimum clearance above the rail of the pilot, snowplow, or endplate shall be three inches."  And then it says, "Except as provided in paragraph B of the section, the maximum clearance shall be six inches."  So it's three to six inches between the rail and the snowplow.

Q.   Okay.  And the reason I asked is, I thought you were including the height of the rail when you were saying it would be impossible to clear -- or it would be hard to clear.  So in other words, he had his leg resting on the rail --

A.   Right.

Q.    -- Right?  And so what you're saying is, according to that regulation, as you read it, the

snowplow would be three to six inches above that rail?

A.   Correct.

Q.   All right.  What is the normal width of a leg?

A.   Depends on the person.  But, you know, when we're talking about an adult male, which he's 17.  So he fits into the adult male.  We're talking about five, six inches.

Q.   Now, do you know how high the rail is?

A.   I don't know. I --

Q.   Do you know how -- I'm sorry?

A.   No.  Go ahead.  I'm sorry.

Q.   Do you know how wide the head of the rail is, the top of the rail?

A.   No, I don't.

Q.   Okay.  Do you know if the locomotive in Bryce Anderson's video had a snowplow -- do you know how high the snowplow was in the Bryce Anderson video over the top of the rail?

A.   I do not.

Q.   Do you know how high the snowplow was over the rail on the actual locomotive that struck Jacob Ohl?

A.   No, I do not.

Q.   And so your -- your theory -- do you know

Page 37

the distance between the snowplow, and the first wheel that struck Mr. Ohl?

A.    No, sir.  I don't.

Q.    So your theory that you provide in the report is that he either tripped or fell forward; is that correct?

A.    That's correct.

Q.    All right.  And then -- in -- and so I think you said his lower legs then would have been parallel to the ground?  They would have been horizontal?

A.    Well, they would have been not standing up really.  They'd be much more horizontal, correct.

Q.    Okay.  Because if -- if -- so under your theory then, his legs are horizontal as the snowplow passes over his legs, and then he's struck by the train?

A.    So if you think about it this way:  A person trying to get off the tracks, tripping, they're obviously -- they're starting this way, they're going to move more horizontal.  So are his legs exactly horizontal, I can't tell you if they're exactly horizontal, or if his knees are bent.  And they're, you know, at a small angle or whatever.  But the fact that it's one foot, his left foot, that is completely mangled.  And the right foot only has a few bruises,

it's much more consistent with his feet being facing down.  Plus all the historical information, which we can talk about in a minute as to what he stated, what the medical records state.  Yes.  I believe that he was getting off of the tracks.  He tripped.  He got stuck.  Now to what exact angle his leg was, I can't tell you that.

Q.   Okay.  In other words, though, if he trips and his leg -- where is his upper body when his legs are that parallel?

A.   Well, his upper body is heading down.  But I can't tell you if he's already on the ground, or if he's about to touch the ground.

Q.   Because if he fall -- if -- if he falls to far forward, right, we're going to have his feet angling up just the other way and running into the same issue you're talking about in terms of the snowplow; aren't we?

A.   Well, if he's all the way on the ground and his leg continues to come up, yes.  But it's his heel, not his toes.  And the toes would be extending up, and his heel wouldn't go as high.  But I -- I agree with you if he goes over -- well, it depends on what part of his legs get stuck.  If his foot get's stuck on the rail, his -- his body will go over.  But -- I may be a

little confused on what you're asking.

Q.   Well, if he trips on the rail --

A.   Uh-huh.

Q.   -- then how is it hitting his leg where it hits it?

A.   Because his foot's on the rail, and the wheel comes and hits his foot.

Q.   Okay.  So you believe the wheel is what hit his foot?

A.   Well, looking at how mangled his foot was, yes.  The wheel ran over his foot, tore his shoe apart, and mangled up his foot.

Q.   All right.  But in other words, you have -- I mean in order for him to clear that snowplow though, his leg has to be vertical.  I mean, horizontal?

A.   Not his whole leg.  It doesn't have to be completely --

Q.   Lower leg.  Sorry, his lower leg.

A.   I mean, it obviously, can't be pointing up in the air to this exact degree of -- exact degree off of horizontal.  I mean -- that's more for a biomechanic to talk about.  I mean, I can't tell you the exact degree.  What I can tell you is, yes, it's more horizontal than it is upright.

Q.   Okay.  And does he remain in that horizontal

position as the snowplow passes over him, and the wheel hit's him?

A.    I -- I mean, again, you're starting to get into biomechanics, and that's not my area.

Q.    I guess I'm a little confused though. You're giving opinions based on where the foot and leg would be position vis-a-vis the rail.  And now I'm asking questions about that, and you're saying that's a biomechanic?

A.    No, no, no.  You're mixing two things up.  I don't think that's fair.  So what I'm saying is, you look at this guy's injuries --

Q.    Yeah.

A.    -- and you look at the testimony of the people -- the train conductor, and then what Mr. Anderson states as to how these injuries occurred, right?  So --

Q.    Let me just stop you there.  You haven't read the testimony of the train conductor?

A.    I'm sorry.  I shouldn't have said testimony. What was seen on the -- what was seen on the body cam video.  I apologize.  So you look at the injuries that he has.  Where his amputations are on his right leg and his left leg, the lack of other injuries.  If he's amputated where he is on his right leg and we're

Page 41

saying that he was struck and he's lying with his right leg closer to the direction that the train is coming on, then his foot is not going to be all the way down.  It'll be struck by the plow.  That's number one.  Number two, he's going to be whipped around when the train hit's him.  He's going to be whipped around like this.  He has no abrasions on his back.  He has no abrasions on the upper leg.  He has no abrasions on his right side.  He has no stretch lacerations.  He has no other injuries to his body.

Q.   Does he have abrasions to his left side?

A.   Not that I saw documented --

Q.   Does he --

A.   -- but that's my point.  There's no --

Q.   Does he have -- does he have abrasions to his front?

A.   No, he does not.

MR. CONLEY:  Jim, let him finish his answer, man.  I mean that's about the third time you've interrupted him. Let him finish his answer please.

A.   (By the Witness)  But that's exactly my point, is that he is not on -- so let's take these scenarios.  We've ruled out, in my opinion, that he's standing up and gets hit by the train while he's

standing.  I think we all agree on that.  He doesn't have anything that shows that he stood in front of this train, and you know, said, "Come and hit me" or whatever, and he get's hit.  So now let's look at the two possibilities.  Whether he be on his back or on his front, lying down on the ground when the train gets him all the way on the ground, you would expect some injuries from the train hitting him and rotating his body -- while his body is on the ground, you would expect some abrasions or some lacerations to some portion of his body, and we don't have that.  Now you can't be on your back in the middle of the -- I guess you could be walking backwards and trip.  But then if you do that, your feet are not going to be down, they're going to be up.  So if you look at him going forward and tripping, the fact that he has these amputations with nothing else, is much more consistent with somebody who is still in the air at some degree versus being on the ground when those legs are run over.  That's what I'm trying to convey.

     Q.   Okay.  So you think he was in the air to some degree when he was run over?

     A.   Absolutely.  He was not all the way on the ground when his legs were run over.

     Q.   I see.  So he would have remained in the air

as the snowplow passed over him and as the front wheel passed over him?

A.    Well, he would have started going down -- he was in the air when the first -- when his left leg was hit.  The first leg was hit.  At what point he hits the ground, I'm not sure.  But it's not when the force of the train whips -- would whip around.

Q.    He hasn't fallen down enough -- under your theory, he had to have fallen forward enough where he's vertical enough that the snowplow passes over his legs, correct?

A.    Where that portion of -- and I'm not saying that the snowplow didn't touch his leg -- his feet or his legs.  But he -- had to be vertical enough that at least the left foot did not get mangled by the -- or did not get hit by the snowplow.  The left foot was run over because it's just -- it's pretty clean -- I'm sorry.  It's -- let me go back.  Let me start -- because I'm starting to get -- say things wrong here.  So he -- the fact that there's no injuries to the front or the back of his body, shows to me that his body is not on the ground when his legs are run over to cause any abrasions.  He is -- now, could he be an inch off the ground, of course, he could be.  Does that mean that his legs are not fully horizontal, no,

Page 44

that's not true at all.  He could be falling forward, not have hit the ground and the train run over his legs.

Q.   This is what I'm saying to you, doctor: There's a distance between the snowplow and the wheel.

A.   Right.

Q.   All right.  For this -- for him to clear the snowplow, he at least has to fall over far enough where his legs are essentially vertical for the snowplow to clear?

A.   You mean horizontal.

Q.   Horizontal.  Sorry.

A.   Well, his left -- his left foot -- yes.  It does have to -- that -- the portion that gets run over has to be horizontal enough to get under the snowplow.

Q.   Correct.  And you're saying that at the time he's hit -- when the wheel hits him, he's still at least not on the ground somewhat --

A.   His body is not on the ground yet.

Q.   Okay.  Right.  You're saying he's still somewhat in the air by the time the wheel passes over him.

A.   Well, I mean he could be -- he could be coming down onto his knees.  I mean -- I can't tell you the specific location?

Q.   Right.

A.   But -- right -- let's put it this why:  He's not face down into the ground.  He not back down onto the ground when he initially gets struck.

Q.   Right.  I understand what you're saying.  In terms of him landing, though, face forward, you didn't see any abrasions -- I think you just said.  There's no indication of abrasions to his front either, correct?

A.   Right.  Nothing that would show me like a road rash where's being swept across anything.

Q.   Right.

A.   But I wouldn't necessarily expect to see it if he's jut falling to the ground.

Q.   You wouldn't?

A.   No, not necessarily.  We see plenty of people who are struck by cars or have other blunt injuries and they go to the ground and they don't have things on their hands or their face.

Q.   Okay.  What about his knees?

A.   Well, it depends.  I wouldn't necessarily see it.  He's got jeans on.  But again, it would depend on the force that his body would hit the ground.  So again, not surprised that he doesn't have anything more.

Page 46

Q.   And why do you think his body -- tell me again, the body turning.  You said -- you kept saying it would necessarily be abrasions to his right hip, if his body turned?

A.   No, no, no, no.  Okay.

Q.   If he were laying on is back, is my question.

A.   Right.  No.  I understand.

Q.   Okay.

A.   So if you have a train coming at whatever it was determined, 44 to 45 or whatever miles per hour --

Q.   Right.

A.   -- and you look -- even if you look at Mr. Anderson's reconstruction, which I know we're not saying that a human body is exactly the same as the dummy, which I agree with.  But you see that the force is going to rotate his body, right?  Naturally, that would happen naturally.  The stretch that you would have in that hip area -- because it is an articulating surface.  And so you would have the legs being moved to his left while the rest of his body is sort of being stretched like this.  He has noting on that right side of his body that's showing any kind of stretch abrasions or lacerations, or any kind of stretch marks.  He has nothing to the back of his head

that shows that his head was being whipped around as his body was being rotated.  So that's what I mean by that.  It's different than an impact abrasion.  What I was talking about on the right side would be stretch abrasions.

Q.   Okay.  And maybe I'm not clear on that. What is a stretch abrasion?

A.   It's like when the body gets stretched.  So there are different patterns of abrasions or blunt impact injuries.  And what I'm taking about is, if he's laying there, his right side gets hit -- now you have to remember under that theory, he's laying on his back on the ground.  So that means that his body is in a stationary position.  It's not moving.  So it's going to have to accept that force.  And so when the train would hit that right side, his body would rotate and he would have some sort of injury either to the back of his head, which is the regular type abrasions, a blunt impact, or on the right side of his body that's stretched.

Q.   Okay.  The rotation you're talking about, would there be rotation if he struck under your theory?

A.   There would be rotation, but he's not on the ground.  His body is not stationary on the ground.

Q.   And I'm sorry -- you mentioned -- I think you said the historical information, which we'll get to.  What were you talking about?

A.   So he's the one who calls 911 himself.  He states that -- I'm trying to look for the exact wording of how I had it written down.  But he states basically to the effect that he was walking, and that he was not sitting on the tracks.  They asked him if he was trying to hurt himself, he says no.  The EMS when they got there, he states that he tripped over the tracks when the train was going by.  The medical center records, including the psychiatry note, states that he was walking on the tracks, and that he tripped.  And then the polygraph that was performed, that's just secondary afterwards, shows no signs of deception.  But really just looking at the EMS, the 911 call, the officers body cam videos, all of those records is very -- is consistent throughout that he says that he tripped trying to get off the tracks.

Q.   Did he testify that he tripped getting off the tracks?

A.   I did not see his deposition testimony.  I'm going off of what he stated right after, and you know, close to the time that this incident occurred.

Q.   Okay.  So you don't know what he testified

to in terms of what happened, or didn't happen?

A. No. I just know what he stated contemporaneous with this accident.

Q. And we also know what the conductor said contemporaneous with the incident, right?

A. That's correct. I know what the conductor said.

Q. And so are you factoring that piece of historical information in?

A. I did. But we've already gone over why I disagree with that from the injury standpoint.

Q. Hold on one second here. I'm just about done. You want to take a five minute break?

A. I'm good either way.

Q. I'm just going to check my notes. There's no reason for y'all to sit here.

MR. CONLEY: A five minute break would be perfect. Let's do that. I need it anyway.

We'll come back about 11:10, 11:15?

MR. CARNES: Yeah. That's great.

(Off the record at 11:05 a.m.)

(Back on the record at 11:13 a.m.)

Q. (By Mr. Carnes) Okay. Dr. Eisenstat, a few more questions about your background. You say you were board certified in pathology. Can you explain to

me what that means?

A.   Sure.  So I went to medical school.  After medical school, I did -- I actually started out in surgery, but then changed to pathology.  So board certification in anatomic pathology is basically passing the exams to be licensed to do hospital pathology looking at biopsies, et cetera.  Then I did three more years of some subspecialty training, which included forensics pathology.  And forensic pathology is really the taking all of the prior knowledge, and then looking at non-natural and natural causes of death, injury, causation, et cetera, to determine the cause and manner of someone's death.  And there are board certifications for that.  And I passed those board certifications as well.  So I'm certified in anatomic and forensic pathology.

Q.   Okay.  Do you know -- do you have any knowledge as to why Jacob Ohl was walking on the tracks?

A.   I don't, other than I think there was a mention in there that he was going somewhere and listening to music.  But as to exactly what he was doing, I don't know.

Q.   Do you know why he wasn't in school that day?

A.    I do not.

Q.    I don't have any more questions for you, sir.  Thank you.

A.    Thank you.

MR. CONLEY:  We've reserved all rights until time of trial, so we're good to do.  John, I presume you want to read and sign?  We didn't talk about it, but --

THE WITNESS:  Yes, please.

MR. CONLEY:  Where do you want that sent?

THE WITNESS:  I will add to the chat, for the court reporter, my e-mail, and it can be sent there.

MR. CONLEY:  Okay.  That's sounds great. Have a good day.

(The deposition hereby concluded at 11:17 a.m.)

C E R T I F I C A T E

STATE OF GEORGIA)

COUNTY OF DOUGLAS)

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the proceedings were reduced to typewriting under my direction and control.

I further certify that the transcript is a true and correct record of the evidence given at the said proceedings.

I further certify that I am neither a relative or employee or attorney or counsel to any of the parties, nor financially or otherwise interested in this matter.

_____
Terri Gandy, CCR
CCR-5767-6962-8202-5984

CERTIFICATE

STATE OF GEORGIA:

COUNTY OF DOUGLAS

I hereby certify that the foregoing transcript was taken down remotely, as stated in the caption, and the questions and answers thereto were reduced to writing by me; that the foregoing 53  pages represent a true, correct, and complete transcript of the evidence given upon said hearing, and I further certify that I am not kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

This 21st  day of May 2021.

_____

TERRI GANDY, CCR

CCR-6962-8202-5984

Page 54

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

May 25, 2021

Dr. Jonathan Eisenstat
jeisenstatmd@gmail.com

Case Name: Ohl, Jacob, et al. v. CSX Transportation, Inc.

Veritext Reference Number: 4514788

Deposition Date:  5/6/2021

Dear Sir/Madam:

Enclosed you will find a transcript of your deposition.

As the reading and signing have not been expressly

waived, please review the transcript and note any

changes or corrections on the errata sheet

included, indicating the page, line number, change and

reason for the change. Sign at the bottom of the sheet

in the presence of a notary and forward the errata sheet

back to us at the address shown above or email to

production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS

        ASSIGNMENT REFERENCE NO: 4514788
        CASE NAME: Ohl, Jacob, et al. v. CSX Transportation, Inc.
        DATE OF DEPOSITION: 5/6/2021
        WITNESS' NAME: Dr. Jonathan Eisenstat
        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
        I have made no changes to the testimony
as transcribed by the court reporter.


_____        _____
Date                    Dr. Jonathan Eisenstat
        Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

        They have read the transcript;
        They signed the foregoing Sworn
                Statement; and
        Their execution of this Statement is of
                their free act and deed.

        I have affixed my name and official seal

this _____ day of_____, 20_____.


                _____
                Notary Public
                _____
                Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4514788
CASE NAME: Ohl, Jacob, et al. v. CSX Transportation, Inc.
DATE OF DEPOSITION: 5/6/2021
WITNESS' NAME: Dr. Jonathan Eisenstat

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____          _____
Date                      Dr. Jonathan Eisenstat

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections
        in the appended Errata Sheet;
They signed the foregoing Sworn
        Statement; and
Their execution of this Statement is of
        their free act and deed.
I have affixed my name and official seal
this _____ day of_____, 20_____.

_____
Notary Public

_____
Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4514788

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____
Date                    Dr. Jonathan Eisenstat

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

               _____

               Notary Public


               _____

               Commission Expiration Date

**[& - answer]**

| & | | | |
|---|---|---|---|

**&**   2:7,11

**0**

**01446**   1:6

**1**

**10.b**   52:5
**1000**   2:8
**10:03**   1:23
**1100**   54:1
**11:05**   49:21
**11:10**   49:19
**11:13**   49:22
**11:15**   49:19
**12**   7:20 32:18
33:14,14 34:6
**13**   7:20
**15-14-37**   52:14
**154**   17:1
**155**   17:1
**17**   13:24 36:6
**18**   27:25
**1820**   54:2
**1:19**   1:6

**2**

**20**   10:21 11:2,4
55:16 56:22 57:22
**2020**   5:25
**2021**   1:25 4:1 52:3
52:21 53:13 54:4
**216-523-1313**   54:3
**21st**   52:21 53:13
**229.123**   34:23
**241-9000**   2:9
**25**   5:25 54:4

**3**

**300**   2:4
**30327-3007**   2:4
**30339-3099**   2:12

**319**   4:6

**4**

**4**   3:3
**404**   2:5
**419**   2:9
**4200**   2:3
**43604-5573**   2:8
**44**   46:11
**44114**   54:2
**45**   46:11
**4514788**   54:7 55:2
56:2 57:2

**5**

**5/6/2021**   54:8 55:3
56:3
**500**   2:12
**53**   53:7
**5767-6962-8202...**
52:24

**6**

**6**   4:1 52:3
**678**   2:13
**6962-8202-5984**
53:23
**6th**   1:23

**7**

**70**   17:16
**75**   2:11

**8**

**809-2580**   2:5
**888-0036**   2:13

**9**

**9-11-28**   52:10
**900**   2:11
**911**   48:4,17

**a**

**a.m.**   1:23 49:21,22
51:18

**abdominal**   28:19
**able**   8:19
**abrasion**   47:3,7
**abrasions**   26:14
41:7,8,8,11,15
42:10 43:23 45:7
45:8 46:3,24 47:5
47:9,18
**absolutely**   42:23
**accept**   47:15
**accident**   13:21
14:8,13,18 25:5
49:3
**accidents**   9:10
10:6,10 11:5,11
**account**   18:21
**accurate**   25:8
**acknowledge**
55:11 56:16
**act**   4:6 20:17,19
20:21 21:11 55:14
56:20
**acts**   20:24
**actual**   6:14 26:22
36:22
**add**   51:11
**additional**   6:3
7:17
**address**   54:17
**addressed**   20:16
**addressing**   28:7
**adjustment**   17:25
18:9
**administering**   4:8
**adult**   36:6,7
**advised**   14:9
**affixed**   55:15
56:21
**afternoon**   10:25
**agency**   52:16

**ago**   7:21
**agree**   4:4,12 21:7
24:5,5,7 25:23
30:24 38:22 42:1
46:16
**agreed**   28:15
**agreement**   1:13
4:9,13
**ahead**   34:12 36:12
**air**   23:20 24:9
29:14,20 30:5
39:20 42:18,21,25
43:4 44:21
**al**   54:6 55:3 56:3
**allowing**   31:14
**american**   52:8,11
52:13,15,18
**amputated**   40:25
**amputation**   9:16
9:25 10:8 15:22
16:4,6,17
**amputations**   16:1
16:2,8,10,16 40:23
42:17
**analysis**   28:4
**anatomic**   50:5,16
**anderson**   5:15
24:22 25:3,14
26:22 28:2 36:18
40:16
**anderson's**   24:15
25:21 26:21 36:17
46:14
**angle**   37:23 38:6
**angling**   38:16
**ankle**   26:4 30:19
33:6 34:5
**ankles**   26:3
**answer**   9:24 15:18
41:18,20

**[answers - change]**

| | | | |
|---|---|---|---|
| **answers** 53:6 | **ave** 54:1 | **blunt** 15:11 45:17 | **cars** 45:17 |
| **anxiety** 12:7 | **b** | 47:9,19 | **case** 1:6 5:8,25 8:3 |
| **anybody** 19:14 | **b** 35:14 52:14 | **board** 49:25 50:4 | 8:14,25 9:5,15,23 |
| **anyway** 49:18 | **back** 20:6 22:25 | 50:14,15 52:5 | 9:25 11:17,23 |
| **anywise** 53:11 | 23:7,19 24:20 | **body** 20:9 23:5 | 16:5,18 17:4 |
| **apart** 39:12 | 26:14,16,19 28:11 | 24:11,13,13 25:9 | 18:16 19:14 21:14 |
| **apologize** 5:21 | 28:12,13 29:7 | 26:13 28:6 38:9 | 21:17,23 22:2 |
| 40:22 | 30:15 31:3,7,16,24 | 38:11,25 40:21 | 32:8,8 52:16,16,19 |
| **appear** 23:14 | 33:1,5 34:4 41:7 | 41:10 42:9,9,11 | 53:10,12 54:6 |
| 25:12 55:11 56:15 | 42:5,12 43:18,21 | 43:21,22 44:19 | 55:3 56:3 |
| **appearances** 2:1 | 45:3 46:6,25 | 45:23 46:1,2,4,15 | **cases** 8:1,6 10:5,8 |
| **appended** 56:11 | 47:13,18 49:19,22 | 46:17,21,23 47:2,8 | 10:9,21 11:1 |
| 56:18 | 54:17 | 47:13,16,19,25 | 13:24 15:7 16:15 |
| **appreciate** 7:9 | **background** 49:24 | 48:17 | **categories** 13:20 |
| **area** 40:4 46:19 | **backwards** 42:13 | **bottom** 54:15 | **catrina** 1:3 |
| **areas** 23:24 | **ballet** 30:2 | **break** 49:13,17 | **causation** 10:9 |
| **article** 52:5 | **based** 18:12 40:6 | **bruises** 37:25 | 50:12 |
| **articulating** 46:19 | **basically** 48:7 50:5 | **bryce** 5:14 36:17 | **cause** 13:4 14:3,18 |
| **articulations** 26:9 | **basics** 12:21 | 36:18 | 30:18 43:23 50:13 |
| **asked** 15:6 23:18 | **behalf** 1:11 2:2,6 | **bureau** 7:15 | **causes** 50:11 |
| 35:18 48:8 | **believe** 13:14 | **business** 7:22 | **ccr** 1:21 52:24 |
| **asking** 39:1 40:8 | 15:16 22:25 23:9 | **c** | 53:22,23 |
| **assessment** 23:13 | 38:4 39:8 | **c** 52:10 | **center** 18:6 48:12 |
| 23:15,16,17 | **bell** 8:2,4 | **ca** 54:25 | **certain** 12:12 |
| **assignment** 55:2 | **bell's** 8:2 | **cale** 2:2,5 | **certainty** 13:6 |
| 56:2 57:2 | **bend** 31:15 32:3 | **calf** 33:6,16 | **certificate** 53:1 |
| **assume** 10:11 | **bent** 31:12,13 | **call** 13:2 48:17 | 56:11 |
| **atlanta** 1:2 2:4,12 | 32:21 37:22 | **called** 15:8 27:9 | **certification** 50:5 |
| 17:9,12 | **better** 28:16 | **calls** 48:4 | 55:1 56:1 |
| **attached** 56:7 | **binding** 4:8 | **calves** 28:13,14,20 | **certifications** |
| **attempt** 20:19 | **biomechanic** | 29:7,8,25 | 50:14,15 |
| 21:6 | 32:16 39:22 40:9 | **cam** 20:9 23:5 | **certified** 1:21 |
| **attempts** 20:25 | **biomechanics** 40:4 | 25:9 40:21 48:17 | 49:25 50:15 52:7 |
| **attorney** 4:22 | **biopsies** 50:7 | **caption** 53:5 | **certify** 53:4,9 |
| **attorneys** 19:8,15 | **bit** 15:4 28:21,24 | **career** 13:17 14:5 | **cetera** 11:21 50:7 |
| **authorize** 56:11 | 30:1 | 14:14 16:15 | 50:12 |
| **authorized** 1:15 | **blanked** 35:4 | **carl** 6:17 | **cfr** 34:23 |
| **autopsied** 10:22 | **bldg1** 2:4 | **carnes** 2:7 3:3 | **change** 13:16 14:7 |
| **autopsy** 16:14 | **blimline** 20:10 | 4:11,11,20,21 6:21 | 14:18 54:14,15 |
| **available** 17:24 | **bloch** 2:11 | 6:25 7:5,9,11 | 56:8 57:3 |
| | | 49:20,23 52:11 | |

**[changed - deposition]**

**changed** 13:25 14:11,12 50:4
**changes** 13:18 54:13 55:7 56:7,9
**changing** 14:2
**charge** 52:18
**chat** 51:11
**check** 49:15
**chief** 7:14 16:24 17:8,15,19
**circle** 2:11
**circumstances** 12:12,15 13:1
**civil** 1:15 55:5 56:5
**claim** 20:4
**clarida** 2:10
**clarify** 6:15
**clean** 43:17
**clear** 18:11 31:6 32:23 35:20,21 39:14 44:7,10 47:6
**clearance** 34:24 34:24 35:7,9,12,15
**cleveland** 54:2
**close** 26:7 48:24
**closer** 30:15 41:2
**cobb** 17:12
**code** 34:22
**collision** 11:6
**collisions** 22:4
**come** 16:1,2 26:12 38:20 42:3 49:19
**comes** 39:7
**coming** 41:3 44:24 46:10
**commencing** 1:23
**commission** 55:19 56:25 57:25

**commit** 20:5
**company** 52:8,11 52:13,15,18
**complete** 53:7
**completely** 7:23 37:24 39:17
**concerning** 5:7
**concluded** 51:17
**conclusions** 13:15
**conductor** 23:7,11 40:15,19 49:4,6
**conference** 15:14
**confused** 39:1 40:5
**conley** 2:2,3 4:13 6:19,23 7:1,6,10 8:5 34:10 41:18 49:17 51:5,10,14
**conleygriggs.com** 2:5
**considering** 25:6
**consistent** 16:11 24:2 26:18 38:1 42:17 48:18
**consulting** 7:19,22 9:7 10:1,15 17:2,3
**contacted** 52:11
**contemporaneous** 49:3,5
**continues** 38:20
**contract** 52:13,15
**convey** 42:20
**cook** 1:3
**corner** 17:11,11
**correct** 7:19 9:13 9:19,22 18:14 20:25 21:3,6,11,12 22:20,21 23:4,8,9 25:22 27:23 28:14 29:4 30:20 36:2 37:6,7,12 43:11

44:16 45:9 49:6 53:7
**corrections** 54:13 56:17
**correctly** 31:9
**council** 52:6
**counsel** 1:13 4:4 52:16 53:9,10
**counseling** 19:4
**counties** 17:1,13 17:18
**county** 17:5 52:3 53:3 55:10 56:15
**couple** 5:11 8:6 10:4 13:24 14:10 14:16 16:22,23 32:20 33:24
**course** 12:21 35:4 43:24
**court** 1:1,21 4:3 51:12 52:5,7,8,11 52:12,13,15,18 55:7
**cover** 17:1,4,6,16 52:17
**crew** 28:8
**csx** 1:7 4:11,22 20:3 54:6 55:3 56:3
**current** 4:5 7:12
**customary** 52:18
**cut** 27:10,12,16,20
**cv** 1:6 15:5

**d**

**damage** 31:21
**dancer** 30:2
**daryl** 2:10
**darylclarida** 2:13
**date** 52:3 54:8 55:3,9,19 56:3,13 56:25 57:20,25

**day** 1:25 7:23 9:7 9:9,11,14,18 10:1 10:15,19,20 15:24 15:25 16:9 50:25 51:15 52:21 53:13 55:16 56:22 57:22
**days** 54:19
**dealing** 9:12
**dear** 54:9
**death** 10:24 13:4,5 13:19,23 14:3,4,11 14:18,20,21 16:8 16:12 17:3 50:12 50:13
**decedent** 16:16
**decedents** 9:8,12 10:12 13:5 16:15
**deception** 48:16
**decide** 13:4
**decided** 13:14
**deed** 55:14 56:20
**deemed** 54:20
**defendant** 1:8 2:6
**defendant's** 3:7
**defendants** 1:11
**defense** 9:5
**degree** 13:6 25:4 30:6 31:25 39:20 39:20,23 42:18,22
**dekalb** 17:12
**delve** 12:18
**department** 54:23
**depend** 30:8 45:23
**depends** 29:21,21 30:12 36:5 38:23 45:21
**deposition** 1:10,19 4:1,7,23 5:2,14,21 19:17 27:1,5,7 28:5 48:22 51:17 52:2,12,13,17 54:8

[deposition - feet]

54:10 55:1,3 56:1 56:3

**depositions** 19:24

**depression** 11:21 12:3,5,7 18:4,13 18:17,23

**description** 3:7

**determine** 11:15 13:22 34:18 50:12

**determined** 12:24 46:11

**died** 9:8

**difference** 13:13 20:18

**different** 33:4 47:3 47:9

**direction** 26:13 41:2

**disagree** 24:8 49:11

**disclosure** 52:1,6

**discount** 52:19

**discuss** 11:1

**disorder** 12:7

**disorders** 11:21

**disqualified** 52:9

**distance** 31:17 37:1 44:5

**district** 1:1,1

**division** 1:2

**doctor** 4:21 44:4

**doctors** 12:22 14:10,15 17:19

**document** 18:4 27:24

**documented** 18:9 23:1 26:17 41:12

**documents** 5:12 5:13 27:21

**doing** 7:19 8:21 26:22,24 27:4

50:23

**douglas** 52:3 53:3

**downslope** 24:24

**downwards** 24:2,4

**dr** 1:10 4:1,16 7:11 49:23 54:5 55:4,9 56:4,13 57:20

**drape** 29:6

**drapped** 28:10,12 29:18 34:6

**drop** 30:19

**drug** 22:2

**due** 18:10

**duly** 4:17

**dummy** 24:22 25:21,22,24 26:5 26:10,11,17 29:4 29:20 46:16

**e**

**e** 6:23 51:12

**earlier** 8:19 18:24

**effect** 31:10 48:7

**eisenstat** 1:10 4:1 4:16 7:11,17 49:23 52:2 54:5 55:4,9 56:4,13 57:20

**either** 19:20 27:15 33:19 37:5 45:8 47:17 49:14

**electronically** 5:3

**email** 54:17

**emergency** 4:5

**employ** 34:17 53:10

**ems** 48:9,16

**enclosed** 54:10

**endplate** 35:11,13

**engage** 21:5

**entered** 56:9

**entering** 14:2

**entire** 5:3 16:25 55:5 56:5

**equipped** 35:10

**errata** 54:13,16,19 56:7,10,18 57:1

**erythematous** 23:24

**essentially** 44:9

**estimate** 10:22

**et** 11:21 50:7,12 54:6 55:3 56:3

**evidence** 17:24 22:14 24:16 32:8 53:8

**exact** 30:25 33:23 34:22 38:6 39:20 39:20,23 48:5

**exactly** 22:21 37:20,21 41:22 46:15 50:22

**examination** 3:2 4:19

**examiner** 7:14 12:12 16:25 17:11 17:15

**examiner's** 17:14

**examiners** 17:8

**exams** 50:6

**exclusive** 52:15

**excuse** 17:11 29:21

**executed** 56:10

**execution** 55:14 56:19

**exhibits** 3:6,7,9

**expect** 42:7,10 45:13

**experience** 15:21

**expert** 25:17 26:6

**expiration** 55:19 56:25 57:25

**explain** 49:25

**expressly** 54:11

**extending** 38:21

**extends** 35:11

**extremities** 22:11 22:15 23:3

**f**

**face** 45:3,6,19

**facilities** 15:10

**facing** 38:1

**fact** 25:24 37:23 42:16 43:20

**factor** 18:15

**factoring** 49:8

**factors** 28:4,8

**fair** 9:14 15:20 19:2 21:1,10 28:9 29:5 40:11

**fall** 29:19 38:14 44:8

**fallen** 43:8,9

**falling** 44:1 45:14

**falls** 38:14

**family** 12:10,11,13 12:16,21 19:13

**far** 22:5 38:15 44:8

**fat** 28:20,22

**father** 19:12,20

**federal** 1:15

**feel** 13:22

**feet** 24:4,8 29:11 29:12,15 30:12 31:6,12,21,21 32:1 32:21,24 33:3,11 33:15,15,18,19 38:1,15 42:14 43:13

**fell** 37:5
**file** 5:3
**filled** 28:20
**financial** 52:19
**find** 8:18,19 22:9 54:10
**fine** 10:19
**fingers** 33:10
**finish** 41:18,20
**firm** 8:2
**first** 4:17 15:21 16:3,5 24:17,23 37:1 43:4,5
**fits** 36:7
**five** 7:21 8:9,18 10:23 13:20 33:22 36:8 49:13,17
**flat** 32:21
**fleshy** 28:14
**flex** 29:13 30:1,23 33:8
**following** 52:6
**follows** 4:18
**foot** 23:22 24:1 29:19 30:22 31:15 37:24,24,25 38:24 39:7,9,10,11,12 40:6 41:3 43:15 43:16 44:13
**foot's** 39:6
**force** 43:6 45:23 46:16 47:15
**forces** 26:12
**foregoing** 53:4,7 55:13 56:18
**forensic** 7:13,17 50:9,16
**forensics** 50:9
**forgot** 5:20
**form** 34:10,12

**forming** 19:16
**forward** 37:5 38:15 42:16 43:9 44:1 45:6 54:16
**found** 17:23,24
**four** 8:18 17:18
**fractures** 23:25
**free** 55:14 56:20
**freestanding** 17:14
**front** 41:16 42:2,6 43:1,21 45:8
**full** 7:14
**fully** 43:25
**fulton** 17:12
**further** 30:12 33:10,18 53:9

**g**

**gandy** 1:21 52:24 53:22
**garland** 2:11
**generally** 9:11
**georgia** 1:1 2:4,12 7:15 16:25 17:2 52:2,6,7 53:2
**georgia's** 17:9
**getting** 33:17,25 34:11 38:5 48:20
**give** 13:5 20:7
**given** 52:19 53:8
**gives** 28:4
**giving** 40:6
**gmail.com** 54:5
**go** 7:8,10 8:17 15:5,6 25:2 27:19 29:12,12 30:3 31:7,16 32:4,23 33:3,17,18 34:7,12 36:12 38:22,25 43:18 45:18

**goes** 38:23
**going** 15:3,6 28:10 28:17,24,25 29:3 29:25 30:1,3,5,6,8 30:22 31:15,25 32:2,5,6 33:11,17 34:10 37:19 38:15 41:3,5,6 42:14,15 42:15 43:3 46:17 47:15 48:11,23 49:15 50:21
**good** 6:22 49:14 51:6,15
**great** 49:20 51:14
**griggs** 2:3
**ground** 32:1,21 37:10 38:12,13,19 42:6,7,9,19,24 43:6,22,24 44:2,18 44:19 45:3,4,14,18 45:24 47:13,25,25
**guess** 7:16 30:11 30:12 32:22 34:14 40:5 42:12
**guy** 33:14
**guy's** 40:12
**gwinnett** 17:5,13 18:5

**h**

**hall** 2:11
**hands** 12:9 22:24 23:2 45:19
**happen** 32:6 46:18 49:1
**happened** 14:16 49:1
**hard** 25:25 35:21
**harm** 21:6
**hbgm.com** 2:13
**head** 14:23 36:13 46:25 47:1,18

**heading** 38:11
**health** 4:6
**hear** 6:18
**heard** 23:6
**hearing** 53:8
**heel** 38:20,22
**height** 31:10 35:19
**hi** 4:21
**high** 11:7 36:9,18 36:21 38:22
**higher** 31:15 32:2 33:11,20
**highlighted** 13:12
**hip** 24:11 46:3,19
**hired** 9:5
**historical** 11:19,24 18:25 38:2 48:2 49:9
**history** 11:20 12:3 12:8,8 17:25 18:4 18:7,13,16
**hit** 22:19 24:19 39:8 41:25 42:3,4 43:5,5,16 44:2,17 45:23 47:11,16
**hit's** 40:2 41:6
**hits** 39:5,7 43:5 44:17
**hitting** 39:4 42:8
**hold** 49:12
**homicide** 13:21 14:8,12,24 15:1,2
**honestly** 9:6
**hope** 25:7 26:7
**horizontal** 24:8 30:7 37:10,12,14 37:20,21,22 39:15 39:21,24,25 43:25 44:11,12,15
**hospital** 50:6

**[hour - lay]**

hour  46:11
huh  29:9 30:17
  39:3
human  25:22 28:4
  28:8 46:15
hurt  48:9

**i**

ideations  18:5
illness  17:25
impact  15:11 47:3
  47:10,19
important  22:22
impossible  31:2,3
  31:5,11,20 34:13
  35:20
impression  26:21
  26:24
inch  28:25 29:2
  35:7,9 43:24
inches  31:10 33:22
  33:25 34:24,25
  35:2,3,5,13,16,16
  36:1,8
incident  11:2
  18:10 19:4 26:25
  48:24 49:5
incidents  11:3,4
  15:13 16:1,13
inclination  29:11
included  50:9
  54:14
including  35:19
  48:12
incorporated
  56:12
index  3:1,6
indicating  54:14
indication  20:17
  22:17,19,24 45:8
individual  11:20

information  11:19
  13:8,22,25 19:1
  38:2 48:2 49:9
initially  45:4
injured  9:12
injuries  15:9,12
  16:11 22:10,24
  23:2,13,16,22
  24:10 26:17 31:22
  31:22 35:2 40:12
  40:16,22,24 41:10
  42:8 43:20 45:18
  47:10
injury  10:9 11:17
  18:19,21 22:14
  26:23 47:17 49:11
  50:12
instance  22:20
intend  7:5
intent  24:7
intentional  20:12
  20:17,19,21,24
  21:11
intentionally
  18:20
interest  52:10
interested  53:11
interrupted  41:20
intoxicated  21:22
investigation
  10:24 11:19
investigations
  7:15
investigators
  12:11,14,20
involve  11:25
involved  9:15 11:5
  11:10 16:8 19:14
involving  8:15
  9:16,25 10:13
  15:22

isolated  16:2,4,6
  16:17
issue  18:9 38:17
it'll  41:4
items  5:7

**j**

jackson  2:8
jacob  1:3,4 6:7
  17:24 18:12 19:3
  19:6,17 22:10,15
  36:22 50:18 54:6
  55:3 56:3
james  1:3 2:7 4:11
  52:11
jamie  4:21 6:19
jcarnes  2:9
jeans  45:22
jeisenstatmd  54:5
jim  41:18
job  7:14,17,23 9:7
  9:9,11,15,19 10:1
  10:16,19,20 15:24
  15:25 16:9
john  34:11 51:6
joint  26:4 30:16
jonathan  1:10 4:1
  4:16 52:2 54:5
  55:4,9 56:4,13
  57:20
judgment  13:2
judicial  52:6
july  5:25
jump  15:3
jurisdiction  16:24
  17:4,5
jut  45:14

**k**

keep  10:18 27:9
kendrick  2:7

kept  46:2
kin  53:9
kind  11:25 19:4
  25:25 27:8 32:10
  46:23,24
knee  30:16 33:9,25
  34:5
knees  30:11 31:14
  31:19 32:2,20
  33:18,20,21 37:22
  44:24 45:20
knocked  22:20
know  6:10 7:4 8:8
  9:3,4,8,24 10:13
  11:4,12 12:4,6,20
  12:21 13:13 14:6
  14:9,14 16:11,21
  18:18 19:3,22
  20:16 21:16,24
  22:1,4,6,23 24:22
  24:25 25:2 26:3,9
  26:10,16 28:7
  31:8 32:17,19,22
  33:23 35:1 36:5,9
  36:10,11,13,16,17
  36:21,25 37:23
  42:3 46:14 48:23
  48:25 49:2,4,6
  50:17,23,24
knowledge  12:19
  19:5 50:10,18
knuckles  33:8

**l**

lacerations  24:1
  24:11,12 41:9
  42:10 46:24
lack  28:16 31:22
  40:24
landing  45:6
lay  29:7 34:4

**laying** 16:19 31:3 33:4 46:6 47:11 47:12
**lead** 35:10
**leave** 30:13
**lectures** 15:17
**left** 37:24 40:24 41:11 43:4,15,16 44:13,13 46:21
**leg** 30:9,22 31:14 34:5,6,21 35:5,22 36:4 38:6,9,20 39:4,15,16,18,18 40:6,23,24,25 41:2 41:8 43:4,5,13
**legal** 54:1 57:1
**legs** 22:18 24:7 28:10,12,17 29:6 29:10,18 30:14,15 30:16 31:4,6,13,24 32:2,24 33:15 37:9,14,15,20 38:9 38:24 42:19,24 43:11,14,22,25 44:3,9 46:20
**letter** 5:5,6 54:20
**licensed** 50:6
**lie** 24:24 28:10
**life** 18:20 21:21
**line** 54:14 56:7 57:3
**list** 5:16,18 8:13 15:5
**listed** 56:7,17
**listening** 50:22
**listing** 56:7
**lists** 5:6
**literally** 27:16
**litigation** 52:19
**little** 15:4 17:10 20:2 28:17,21,24

39:1 40:5
**live** 25:22
**lived** 9:17,18
**llc** 7:18,22,24
**llp** 2:3,7,11
**location** 44:25
**locomotive** 31:2,5 31:6 34:8 35:10 36:16,22
**long** 7:5,21
**look** 6:2,3,12,14 8:17 10:8 11:16 11:17,22,25 12:2,2 12:5,7,25 15:21 16:4 18:25 20:6 22:25 24:21 27:6 31:7,16,16 34:25 40:12,14,22 42:4 42:15 46:13,13 48:5
**looked** 5:20 6:5,13 8:6 10:5 16:7 20:12 32:25
**looking** 25:17 34:20 39:10 48:16 50:7,11
**looks** 35:2
**loop** 2:7
**low** 11:8
**lower** 22:11,15 29:10 30:9,14,15 30:16,19 31:4 33:5 34:5 37:9 39:18,18
**lying** 23:7,19 24:20 26:15,18 28:11 29:15,17,17 31:24 33:1,15 41:1 42:6

**m**

**madam** 54:9
**mail** 6:23 51:12
**majority** 16:23 21:19,20,21
**male** 36:6,7
**man** 41:19
**mangled** 37:25 39:10,12 43:15
**manner** 13:4,19 13:23 14:3,11,20 14:21 50:13
**manners** 16:12
**marks** 46:25
**martin** 20:11,11
**materials** 5:10 27:9,17
**maximum** 34:24 35:15
**mean** 9:2 10:15 12:25 13:3,7,10 15:11,24 18:2,3 21:2,18 25:15 28:13,19,20,23,25 29:1,16 30:2,10 32:19 33:20 34:13 39:14,15,19,21,22 40:3 41:19 43:25 44:11,23,24 47:2
**means** 47:13 50:1
**measure** 33:21 35:2
**measurement** 33:23
**measurements** 31:8,17 32:13 35:1
**mechanism** 26:23
**medical** 7:14 10:9 12:2,8,12,19,20 13:6 16:24 17:8

17:10,11,14,15 18:5 38:4 48:11 50:2,3
**medications** 12:4 12:6
**meeting** 14:10
**member** 7:24
**members** 19:13
**mention** 50:21
**mentioned** 18:24 21:13 25:20 48:1
**methodology** 34:18,20
**metro** 17:9,12
**meyer** 2:11
**mid** 33:6
**middle** 33:16 42:12
**midwest** 54:18 57:1
**miles** 46:11
**mind** 9:4 19:23 20:7
**minimal** 28:25
**minimum** 31:9 33:16 34:24 35:12
**minute** 38:3 49:13 49:17
**mixed** 17:10
**mixing** 40:10
**mixture** 11:11
**moment** 20:7
**morning** 7:3 10:25
**mother** 19:10,20
**motor** 22:4
**movable** 26:4
**move** 27:17 37:20
**moved** 24:14 46:20
**moving** 24:6,21 33:10 47:14

Case 1:19-cv-01446-SCJ    Document 129-1    Filed 04/08/22    Page 65 of 72

**[multiple - pertains]**                                                      Page 8

| | | | |
|---|---|---|---|
| **multiple**  17:8,18 | **o** | 24:17 25:2 27:19 | **part**  9:25 13:2 |
| **muscle**  28:22 | | 27:24 28:1,9 30:8 | 16:8 18:25 24:1 |
| **muscles**  28:21 | **o.c.g.a.**  52:10,14 | 31:1 32:13,19 | 30:8,13 38:23 |
| **music**  50:22 | **oath**  4:8 | 34:2 35:18 36:16 | 56:9 |
| **mute**  6:18 34:12 | **object**  34:10,12 | 37:13 38:8 39:8 | **parties**  9:12 52:18 |
| **n** | **objection**  4:7 | 39:25 42:21 44:20 | 53:9,11 |
| | **obviously**  13:12 | 45:20 46:5,9 47:6 | **partin**  2:3 |
| **name**  4:21 54:6 | 14:7 25:21,25 | 47:21 48:25 49:23 | **party**  52:16,19 |
| 55:3,4,15 56:3,4 | 37:19 39:19 | 50:17 51:14 | **passed**  23:8 43:1,2 |
| 56:21 | **occupation**  7:12 | **once**  13:17,25 15:1 | 50:14 |
| **national**  4:5 | **occurred**  40:16 | **ones**  14:6 16:7 | **passes**  37:15 40:1 |
| **natural**  1:3 13:20 | 48:24 | **opinion**  5:4,6 13:3 | 43:10 44:21 |
| 29:11,19 32:3 | **odd**  24:23 | 13:7,11,14,16 | **passing**  50:6 |
| 33:11 50:11,11 | **office**  4:24 10:24 | 18:19 23:10 34:15 | **paste**  27:10,13,17 |
| **naturally**  46:17,18 | 17:16 | 34:17 41:24 | 27:21 |
| **necessarily**  45:13 | **officer**  4:7 20:10 | **opinions**  13:13,18 | **pathologist**  7:13 |
| 45:16,21 46:3 | 23:6,12 | 17:21 18:16 19:16 | **pathology**  7:17 |
| **need**  10:16 12:18 | **officers**  48:17 | 27:11,12 28:5 | 23:23 49:25 50:4 |
| 12:19 29:22 49:18 | **offices**  17:14,15,18 | 40:6 | 50:5,7,9,9,16 |
| **needed**  12:17 | 52:11 | **opposed**  9:12 | **pattern**  18:19,21 |
| **never**  9:15 16:2 | **official**  55:15 | 29:13,19 | **patterns**  11:17 |
| 19:16,19 32:6 | 56:21 | **order**  11:2 33:24 | 47:9 |
| **non**  34:19 50:11 | **oh**  5:19 6:12,21 | 39:14 | **pdf**  27:16 |
| **normal**  34:21 36:3 | 10:20 | **outside**  10:1 17:17 | **pedestrian**  22:6 |
| **normally**  22:3 | **ohio**  2:8 54:2 | **overlies**  28:22 | **people**  21:2,5 |
| **northern**  1:1 | **ohl**  1:3,3,4 18:13 | **oversee**  10:24 | 32:16 40:15 45:17 |
| **northside**  2:3 | 19:3,6,9 20:4 23:7 | **p** | **percent**  17:16 |
| **notary**  1:21 54:16 | 26:18,23 36:23 | | **percentage**  11:8,8 |
| 54:25 55:10,18 | 37:2 50:18 54:6 | **page**  3:2,7 5:8 | **perfect**  49:18 |
| 56:15,23 57:23 | 55:3 56:3 | 15:6,6 17:21 | **perform**  28:4 |
| **note**  22:23 48:12 | **ohl's**  6:7 19:17 | 22:11 34:3 54:14 | **performed**  48:14 |
| 54:12 | 25:5 | 56:7 57:3 | **person**  9:17,18 |
| **noted**  18:7 24:18 | **okay**  5:1,6,22,24 | **pages**  27:24,25 | 15:22 16:18 26:11 |
| **notes**  20:7 27:6,8 | 6:7,10,16 7:11,16 | 53:7 | 36:5 37:17 |
| 27:14 49:15 | 7:24 8:1,8,23 10:7 | **pan**  28:20 | **person's**  31:6,19 |
| **noting**  46:22 | 10:11 11:12,24 | **paragraph**  22:12 | **personal**  4:25 |
| **number**  5:7 16:13 | 12:24 13:9 14:22 | 35:14 | **personally**  55:11 |
| 41:4,5 54:7,14 | 15:3 16:3,21,24 | **parallel**  37:9 | 56:15 |
| **numbers**  56:7 | 17:20,22 19:10,19 | 38:10 | **personnel**  23:18 |
| **nw**  2:3 | 19:22 20:1,14 | **parents**  1:4 | **pertains**  9:9 22:5 |
| | 21:8,13,16 22:13 | **parkway**  2:3,11 | |
| | 22:17 23:5,15 | | |

**pertinent** 27:20
**phone** 54:3
**photographs** 6:14 25:17
**photos** 6:7 25:10 25:13
**physical** 22:10,14
**pictures** 6:4,20
**piece** 49:8
**pilot** 35:11,13
**plaintiff** 4:14 9:5
**plaintiff's** 8:11
**plaintiffs** 1:5 2:2
**plantar** 29:12,13 30:1,23
**plastic** 25:25 29:4
**please** 4:9 41:21 51:9 54:12
**plenty** 45:16
**pliable** 26:11
**plow** 31:5 32:23 41:4
**plus** 38:2
**point** 29:13 33:7 34:6 35:8,8 41:14 41:23 43:5
**pointed** 24:19
**pointing** 23:20 24:2,3,9 25:1 29:13 30:3,5 31:25 32:2 39:19
**polygraph** 48:14
**portion** 31:14 33:5 42:11 43:12 44:14
**position** 24:24 29:19 40:1,7 47:14
**positioning** 28:5
**positions** 33:4
**possibilities** 42:5

**possibility** 18:8
**possible** 26:8 32:23 34:4,14
**practice** 10:9
**preparation** 5:2
**presence** 54:16
**presentations** 15:15
**presume** 51:7
**pretty** 8:16 43:17
**printed** 5:4
**prior** 15:7 19:4 50:10
**probable** 34:14,15 34:17,18,19
**probably** 7:21 8:9 10:5,20 11:1 15:3 16:23 17:16
**problem** 7:1
**procedure** 1:17 55:5 56:5
**proceed** 4:3
**proceedings** 3:1
**production** 54:18 54:23
**prohibited** 52:14
**provide** 37:4 52:11,15
**provided** 8:14 35:14
**provisions** 52:10
**psych** 20:13
**psychiatric** 11:21 17:25 18:9
**psychiatrist** 18:7
**psychiatry** 18:6 48:12
**public** 1:23 4:6 55:10,18 56:15,23 57:23

**publications** 15:8 15:9
**purposes** 1:13
**pursuant** 1:11 4:5 52:5
**put** 5:19,20 24:22 45:2

**q**

**question** 34:2 46:7
**questions** 40:8 49:24 51:2 53:5
**quicker** 7:2

**r**

**r** 2:7
**rail** 28:13,23 29:8 29:10,18,25 30:9 30:11,15,20 31:18 32:24 33:23 34:7 35:12,17,19,22 36:1,9,13,14,19,22 38:25 39:2,6 40:7
**railroad** 8:15,25 9:4,10,16 10:5 15:9,13,19
**railroads** 10:13 15:15
**rails** 28:11,12,18 31:4 35:12
**ran** 39:11
**rarely** 13:17
**rash** 45:11
**rates** 52:18
**reaction** 18:1,10
**read** 19:24 35:25 40:19 51:7 55:5,6 55:12 56:5,6,17
**reading** 1:17 54:11,20
**reality** 26:8

**really** 5:4 6:6 12:9 12:17 13:18 21:18 25:19 27:10,11,12 29:1 34:2 37:12 48:16 50:10
**reason** 9:3 35:18 49:16 54:15 56:8 57:3
**reasonable** 13:6
**recall** 9:6,6 14:12 14:22 16:5 21:23 23:1
**receipt** 54:19
**received** 5:11 6:4 13:25 34:22,22
**reckless** 21:3
**recollection** 8:20 9:1
**reconstruction** 25:7 26:25 32:15 46:14
**record** 4:4,10 27:20 49:21,22 56:9
**records** 12:2 17:23 18:12 20:3 22:9 38:4 48:12,18
**recreate** 26:22
**reduced** 53:6
**reference** 54:7 55:2 56:2
**referenced** 23:6 55:11 56:15
**referral** 52:16
**reflect** 22:9
**regular** 47:18 53:10
**regulation** 35:7,25
**regulations** 52:5
**relate** 15:9

**relationship** 52:9
**relevant** 18:15
**remain** 39:25
**remained** 42:25
**remember** 7:20
9:2 31:9 47:12
**remote** 1:10 4:1
**remotely** 4:9 53:5
**report** 5:8,21 6:1
15:4 17:21 21:14
21:19,23 22:8
23:23 26:7 37:5
**reporter** 1:21 4:3
51:12 52:7,16
55:7
**reporting** 52:5,8
52:11,12,13,15,15
52:16,18
**reports** 21:13
**represent** 53:7
**representative**
52:8
**request** 11:18 56:9
56:11
**required** 54:25
**reserved** 1:19 51:5
**residence** 4:25
**respond** 23:17
**rest** 11:9 17:17
46:21
**resting** 30:9,10
32:24 35:22
**result** 53:11
**returned** 54:19
**reverse** 14:13
**review** 27:1 54:12
55:1 56:1
**reviewed** 5:7,10
5:12,14 9:15,23,25
10:14,21 16:14
18:12,14 19:16,19

20:4 27:10,11,18
**rifling** 7:8
**right** 5:19 7:3 8:10
8:23 9:23 11:9
12:15 13:15 14:17
15:14,20 18:11,15
18:23 19:22 22:1
23:21,22 24:10,13
25:12,20 26:1,3,14
26:20 27:1,22
28:1,3,7,18 29:3
30:19,23 33:2,13
34:16 35:6,23,24
36:3 37:8,25
38:15 39:13 40:17
40:23,25 41:2,9
44:6,7,20 45:1,2,5
45:10,12 46:3,8,12
46:17,23 47:4,11
47:16,19 48:23
49:5
**rights** 51:5
**road** 45:11
**rotate** 10:25 46:17
47:16
**rotated** 47:2
**rotating** 42:8
**rotation** 47:21,22
47:24
**rough** 10:22
**ruled** 41:24
**rules** 1:15 52:5
55:5 56:5
**ruling** 34:3
**run** 24:3 33:17
42:19,22,24 43:17
43:22 44:2,14
**running** 38:16

**s**

**s** 56:8,8 57:3
**saw** 20:9 41:12
**saying** 6:17 30:25
32:22 35:20,24
40:8,11 41:1
43:12 44:4,16,20
45:5 46:2,15
**says** 5:7 17:23
22:9 35:14 48:9
48:19
**scenarios** 41:24
**scene** 6:4 11:18
25:10 32:11
**school** 50:2,3,24
**scj** 1:6
**screen** 22:2
**seal** 55:15 56:21
**second** 17:21
22:12 28:1 49:12
**secondary** 18:1
48:15
**section** 4:6 15:7
27:16 35:15
**see** 8:13 12:2,5
20:4 21:14 22:14
22:23 25:15 27:20
28:3 31:8 33:11
33:22,25 42:25
45:7,13,16,22
46:16 48:22
**seeing** 16:5 21:23
23:1
**seen** 9:7 10:21
11:1 15:25,25
16:15,16 18:6,22
20:1,3 23:5 25:9
31:12,20 32:7
40:21,21
**self** 21:6

**send** 6:19 7:3
**sense** 24:10 31:23
32:9
**sent** 51:10,12
**sentence** 22:12
**separate** 7:23 10:9
10:18
**services** 52:12,15
**shadow** 25:16
**sheet** 54:13,15,16
56:7,10,18 57:1
**shoe** 6:10 32:17
34:6 39:11
**shoes** 6:4,8,11,12
6:14 33:15
**short** 21:6
**show** 24:12 45:10
**showing** 46:23
**shown** 24:14 54:17
**shows** 42:2 43:21
47:1 48:15
**shumaker** 2:7
**shumaker.com**
2:9
**side** 7:16 8:11
23:21 24:10,13
41:9,11 46:23
47:4,11,16,19
**sign** 51:7 54:15
**signed** 55:13 56:18
**significance** 22:16
**significant** 22:10
23:22
**signing** 1:17 54:11
54:20
**signs** 48:15
**sincerely** 54:21
**single** 7:24
**sink** 28:17,24 29:1
29:3

sinks 28:23
sip 29:22
sir 5:9 6:9,13 19:7
  19:11 27:15 37:3
  51:3 54:9
sit 8:25 49:16
sitting 48:8
six 34:25 35:2,5,7
  35:9,16,16 36:1,8
size 32:17,18
  33:14 34:6
sky 23:21
slope 25:3,4,15,18
sloped 25:13
small 23:24 37:23
snow 32:23
snowplow 34:7
  35:11,13,17 36:1
  36:17,18,21 37:1
  37:14 38:18 39:14
  40:1 43:1,10,13,16
  44:5,8,10,15
social 12:8
soft 28:14
solutions 54:1
  57:1
somebody 18:19
  42:18
somebody's 26:15
  34:21
someone's 28:9
  32:24 50:13
something's 12:24
somewhat 44:18
  44:21
sorry 5:17,19
  10:16 14:21 18:8
  34:11 36:11,12
  39:18 40:20 43:18
  44:12 48:1

sort 11:22 31:19
  46:21 47:17
sounds 51:14
speak 12:22,23
  19:6,7,8
speaking 20:10,11
specific 8:20,22
  15:11,13,15,18
  16:22 31:8,18
  35:1 44:25
specifically 14:15
  14:17 18:23 26:9
specifics 26:16
spoken 19:8,10,12
  19:13
standard 22:2,7
standing 24:5
  37:11 41:25 42:1
standpoint 49:11
start 24:17 33:5,17
  43:18
started 7:21 43:3
  50:3
starting 37:19
  40:3 43:19
state 4:9 13:23
  16:25 17:2,17,17
  19:23 38:4 52:2
  53:2 55:10 56:15
stated 20:12 21:12
  23:9,19 28:7 38:3
  48:23 49:2 53:5
statement 55:13
  55:14 56:19,19
states 1:1 40:16
  48:5,6,10,12
stationary 47:14
  47:25
stood 42:2
stop 24:15 40:18

straight 20:12
  29:14,20 30:4
street 2:8
stretch 24:11 41:9
  46:18,24,25 47:4,7
stretched 46:22
  47:8,20
strikes 24:4
struck 16:19 18:1
  21:22 22:6,18
  23:21 24:5 36:22
  37:2,15 41:1,4
  45:4,17 47:22
stuck 38:6,24,24
subscribed 55:10
  56:14 57:21
subspecialty 50:8
suicidal 18:4 24:7
suicide 11:15
  12:25 13:20 14:2
  14:3,4,8,12,19,24
  15:1,2 18:22 20:2
  20:5,19,21,25 21:6
  21:9
suicides 11:11,13
suite 2:4,12 54:2
superior 54:1
supplied 19:21
sure 6:21 8:16
  20:8 27:8 29:23
  30:21 33:24 43:6
  50:2
surface 46:20
surgery 50:4
surprised 45:24
survived 9:21
swept 45:11
sworn 4:17 19:17
  55:10,13 56:14,18
  57:21

system 17:10,11
  17:19

t

take 4:22 6:2 9:21
  12:25 18:20,21
  20:12 21:21 23:10
  27:16 41:23 49:13
taken 1:11,11,13
  1:19 21:25 53:4
talk 11:24 12:10
  12:11,13,16 20:2
  23:23,24 35:8
  38:3 39:22 51:8
talked 32:19
talking 28:2 35:9
  36:6,7 38:17 47:4
  47:21 48:3
talks 34:23
tell 13:10 34:22
  37:21 38:7,12
  39:22,23 44:24
  46:1
telling 23:11
ten 10:23
tendered 3:9
term 28:16
terms 4:23 10:12
  25:20 38:17 45:6
  49:1
terri 1:19 52:24
  53:22
testified 4:18 8:14
  8:23,25 9:9 48:25
testify 48:20
testifying 31:1,11
testimony 18:12
  19:17,19 27:2,5
  32:7 40:14,19,20
  48:22 55:6,7 56:6
  56:9,12

**thank** 51:3,4
**theory** 36:25 37:4
37:14 43:9 47:12
47:23
**thereto** 53:6
**thing** 5:4 6:2,5
20:9 24:18 30:19
30:25
**things** 11:22,25
18:24,25 21:3
22:8 27:20 31:19
32:20 40:10 43:19
45:19
**think** 5:23 7:6 8:3
8:24 9:8,24 13:11
14:9,25,25 15:1,12
34:2 37:8,17
40:11 42:1,21
45:7 46:1 48:1
50:20
**third** 41:19
**thirty** 54:19
**thought** 21:9,10
35:18
**three** 17:18 31:10
34:24 35:8,13,16
36:1 50:8
**thrown** 24:6
**time** 5:11 7:14
15:21 24:19 25:5
35:3 41:19 44:16
44:21 48:24 51:6
**times** 14:16
**tiny** 30:1
**today** 4:23,24 5:1
9:1
**toes** 23:20 24:2,3,8
24:18,25 30:3
31:24 33:9 38:21
38:21

**told** 12:4 32:18
**toledo** 2:8
**top** 14:22 31:18
36:14,19
**tore** 39:11
**torso** 24:12
**totality** 11:16,23
13:1
**touch** 38:13 43:13
**toxicology** 11:22
21:13,14,19,23
**track** 35:5
**tracks** 16:19 37:18
38:5 48:8,11,13,19
48:21 50:19
**train** 10:10 11:2,3
11:4,5 15:23,25
16:19 18:2 22:5,6
22:18,19 23:8,18
24:4,6,14 25:16
28:8 37:16 40:15
40:19 41:2,6,25
42:3,6,8 43:7 44:2
46:10 47:16 48:11
**trained** 12:20
16:13 30:2
**training** 50:8
**trains** 21:22
**transcribed** 55:7
**transcript** 53:4,8
54:10,12 55:5,12
56:5,11,17
**transportation** 1:7
4:22 54:6 55:3
56:3
**trauma** 18:1
**traumatic** 15:22
16:11
**trial** 51:6
**trip** 42:13

**tripped** 37:5 38:5
48:10,14,19,20
**tripping** 37:18
42:16
**trips** 38:8 39:2
**true** 44:1 53:7
**truth** 23:11,14
**trying** 14:9 18:20
20:5 26:22 37:18
42:20 48:5,9,19
**turned** 26:13 46:4
**turning** 46:2
**twice** 13:17
**two** 6:4,7,20 8:17
22:11 40:10 41:5
42:5
**type** 21:5 23:25,25
34:17 47:18
**typed** 27:14,15

---

**u**

**uh** 29:9 30:17 39:3
**ultimately** 13:1
**undergone** 19:3
**understand** 45:5
46:8
**understanding**
35:6
**undetermined**
13:19,19,21,23
**united** 1:1
**upper** 23:3 38:9
38:11 41:8
**upright** 39:24
**upwards** 24:19
**use** 11:19,22
**usual** 52:18
**usually** 5:19 12:13
19:7 22:5,7 26:11
32:15,16
**utilize** 11:18

**utilizing** 13:7 28:6

---

**v**

**v** 1:6 54:6 55:3
56:3
**vast** 21:19,20
**vehicle** 11:5,6 22:4
**veritext** 54:1,7
57:1
**veritext.com.**
54:18
**versus** 42:19
**vertical** 39:15
43:10,14 44:9
**video** 11:18,18
20:10 21:8 23:6
24:15 25:3,9,14
36:17,18 40:22
**videos** 25:13,21
48:17
**vis** 40:7,7

---

**w**

**waived** 54:12,20
**walking** 42:13
48:7,13 50:18
**want** 6:19 7:7,7
49:13 51:7,10
**wants** 12:22
**ward** 20:13
**water** 29:22
**way** 14:1,2,25 20:1
24:21,23,25 30:4,6
32:1 33:19 37:17
37:19 38:16,19
41:4 42:7,23
49:14
**we've** 15:25 18:22
41:24 49:10 51:5
**wearing** 34:6
**wears** 32:18 33:14

**[weird - zoom]**

| | |
|---|---|
| **weird**  17:10 | **z** |
| **went**  50:2 | **zoom**  1:25 |
| **wheel**  37:1 39:7,8 | |
| 39:11 40:2 43:1 | |
| 44:5,17,21 | |
| **whip**  43:7 | |
| **whipped**  24:13 | |
| 26:15 41:5,6 47:1 | |
| **whips**  43:7 | |
| **wide**  36:13 | |
| **width**  34:21 36:3 | |
| **witness**  4:8 6:17 | |
| 34:13 41:22 51:9 | |
| 51:11 55:1,4,11 | |
| 56:1,4,15 | |
| **word**  35:4 | |
| **wording**  48:6 | |
| **words**  9:20 11:5 | |
| 16:7 21:2 22:19 | |
| 27:19 28:17 35:21 | |
| 38:8 39:13 | |
| **wore**  32:17 | |
| **work**  7:19,22 9:7 | |
| 10:1,15 17:2,4 | |
| **worked**  8:1 | |
| **world**  13:12 | |
| **writing**  53:6 | |
| **written**  48:6 | |
| **wrong**  13:9,11 | |
| 43:19 | |
| **wrote**  6:1 | |

| | |
|---|---|
| **y** | |
| **y'all**  49:16 | |
| **yeah**  6:21,25 9:2 | |
| 10:17,19,19 17:9 | |
| 21:4 27:12 29:1,6 | |
| 30:12,24 40:13 | |
| 49:20 | |
| **years**  7:20,21 8:7 | |
| 8:18 10:4,23 | |
| 13:24 14:11 50:8 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.